# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

DARIN J. FRANKLIN,

    Plaintiff,

v.

TANIA ARGUELLO, *et al.*,

    Defendants.

Case No.: 3:15-cv-00196-RCJ-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF Nos. 112, 113

This Report and Recommendation is made to the Honorable Robert C. Jones, Senior United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Plaintiff's motion for summary judgment. (ECF No. 112.) Defendants filed a response. (ECF Nos. 125, 125-1 to 125-9.) Plaintiff filed a reply. (ECF No. 128.)

Defendants have also filed a motion for summary judgment. (ECF Nos. 113, 113-1 to 113-4.) Plaintiff filed a response. (ECF No. 119.) Defendants filed a reply. (ECF No. 123.)

After a thorough review, it is recommended that Plaintiff's motion be denied, and that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

When he filed this action, Plaintiff was an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Am. Compl., ECF No. 22.) Plaintiff has since been paroled. The events giving rise to this action took place while Plaintiff was housed at Warm Springs Correctional Center (WSCC), Northern

Nevada Correctional Center (NNCC), and Ely State Prison (ESP). (*Id.*) The remaining Defendants are Eugene Murguia and Renee Baker.

After screening the original and amended complaints, District Judge Jones determined Plaintiff could proceed with the following claims, now set forth in the amended complaint: due process claims against Murguia in Counts I and II (identified as Counts II and III in the original complaint); Eighth Amendment deliberate indifference claims against Dr. Koehn in Count III (identified as Count IV in the original complaint); and First Amendment free exercise of religion claims against Baker in Counts IV and V (identified as Counts VI and VII in the original complaint). (*See* ECF Nos. 9, 12, 21.)

Defendants subsequently moved to dismiss Counts I-III, though the motion was actually one for summary judgment in some respects because it relied on evidence beyond the allegations of the amended complaint. The undersigned issued a report and recommendation that the motion be denied. District Judge Jones accepted the recommendation in part and rejected it in part. (ECF No. 80.) District Judge Jones granted summary judgment as to the deliberate indifference claims asserted against Dr. Koehn in Count III of the amended complaint. With respect to Counts I and II, District Judge Jones required a more definite statement given Plaintiff's allegation that he lost statutory good time credits as a result of the disciplinary hearings, which he could not challenge until the convictions were reversed or vacated.

Plaintiff filed a clarification regarding the loss of good time credits indicating he does not allege he had statutory good time credits forfeited as a result of the alleged procedurally deficient disciplinary hearings because even though he was submitted for a loss of good time credits, they were ultimately never forfeited. (ECF No. 83.)

Therefore, the action is now proceeding on the due process claims against Murguia in Counts I and II and the First Amendment free exercise claims against Baker in Counts IV and V. The court will now provide a summary of the allegations, detailing Plaintiff's averments insofar as they were allowed to proceed by District Judge Jones.

In Count I, Plaintiff alleges that on March 26, 2013, he was issued a notice of charges for fighting, failing to follow rules and regulations and giving false information. (ECF No. 22 at 13.) A disciplinary hearing was conducted by Murguia on April 5, 2013 at NNCC. (*Id*.) Plaintiff asked to call witnesses, including the unidentified charging employee and the other individual involved in the fight, but Murguia said Plaintiff would not be permitted to call the "victim" as a witness, which Plaintiff claims indicates Murguia's bias. (*Id*. at 13-14.) Murguia prohibited other witnesses, stating they would be redundant. (*Id*. at 14.) Plaintiff avers that the charging employee's report said that "staff" observed the incident, without identifying who witnessed the fight. (*Id*.) Plaintiff was found guilty, and the report was the only evidence used to convict him. (*Id*. at 15.) He was sentenced to 60 days in disciplinary segregation. (*Id*.)

In Count II, Plaintiff alleges that on March 26, 2013, he was also issued charges for assault, battery, possession of contraband, and giving false information. (*Id*. at 21.) Murguia conducted a disciplinary hearing at NNCC on April 17, 2013. (*Id*.) Again, Murguia would not allow Plaintiff to call witnesses, including the charging employee, because the testimony would be redundant. (*Id*.) Murguia identified the charging employee as Plaintiff's victim, which Plaintiff again claims shows Murguia's bias. (*Id*. at 22.) Plaintiff was found guilty based only on the written information presented in the charging employee's notice of charges. (*Id*.) Plaintiff was sentenced to 18 months in disciplinary segregation. (*Id*.)

Plaintiff avers that in connection with these disciplinary convictions, he was required to pay restitution, which was deducted from his account. (*Id*. at 10.) He was transferred to ESP, a maximum-security prison, to serve consecutive sentences totaling 20 months, but ultimately spent 32 months in disciplinary segregation at ESP followed by 54 days in administrative segregation at NNCC. (*Id*.) He claims the conditions at ESP amounted to an atypical and significant hardship in relation to the ordinary incidents of prison life. (*Id*.)

In Count IV, Plaintiff alleges that when he was transferred to ESP in April 2013 to serve his disciplinary segregation sanction through December 23, 2015, he was not allowed to access any "corporate" (group) Christian worship service, which is part of his religious practice. (*Id*. at 40.)

In Count V, Plaintiff alleges that while at ESP he was also precluded from receiving the religious sacrament of communion. (*Id*. at 43-44.)

While Plaintiff titles his motion as one for partial summary judgment, he moves for summary judgment with respect to all of the remaining claims.

Defendants also move for summary judgment, arguing: (1) Plaintiff may not recover monetary damages against Defendants sued in their official capacities; (2) his injunctive relief claims are moot because he has been released; (3) Plaintiff's due process claims fail to the extent they are based on an inability to call witnesses because his lists were outrageous and failed to add any relevant history and he received constitutionally adequate hearings; (4) Plaintiff failed to plead personal involvement of defendant Baker so as to state a colorable Eighth Amendment[1] claim against her.

---

[1] The motion references the Eighth Amendment, but presumably refers to the First Amendment free exercise claims allowed to proceed in Counts IV and V against Baker. (ECF No. 113 at 7.)

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-50. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the

moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmoving party is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

# III. DISCUSSION

**A. Count I**

### 1. Summary of Argument

Plaintiff argues that the notice of charges written by Sergeant Madieros states that it was observed by "staff" that Plaintiff violated prison rules, but the "staff" who supposedly witnessed the alleged infraction were never identified; therefore, Plaintiff contends there is no credible evidence that he committed an infraction. In addition, Plaintiff asserts that he asked to call witnesses, including Madieros, but Murguia denied his request. He was found guilty based only on the statement in the notice of charges. Plaintiff states that $50 for restitution was deducted from his inmate account.

In the defense motion and response to Plaintiff's motion, Murguia argues that Plaintiff received a constitutionally adequate disciplinary hearing because the witness list offered was outrageous and the conviction was supported by some evidence. He asserts that NDOC had a clear institutional safety and security interest in not transporting hundreds of inmates to and from a disciplinary hearing. He also asserts that there is not an unfettered right to call witnesses, and there is no due process violation for denying witnesses who lack new or relevant information. Murguia maintains calling the witnesses requested would have been redundant and irrelevant. He asserts that Plaintiff admitted at the hearing he was not even sure what witnesses would be relevant as he did not know who was present and who was not.

### 2. Standard

An inmate is entitled to certain procedural due process protections in connection with a disciplinary violation if the disciplinary proceeding implicates a protected liberty interest in some "unexpected manner" or imposes "an atypical and significant hardship on the inmate in relation to

the ordinary incidents of prison life." *See Serrano v. Francis*, 345 F.3d 1071, 1077-78 (9th Cir. 2003) (citing *Wolff v. McDonnell*, 418 U.S. 539, 564-71 (1974); *Sandin v. Connor*, 515 U.S. 472, 484 (1995); *Ramirez v. Galala*, 334 F.3d 850, 860 (2003)).

Assuming the inmate has a protected liberty interest, an inmate facing a disciplinary proceeding is entitled to receive advance written notice of the violation; at least 24 hours between the time the prisoner receives the written notice and the time of the hearing, so the prisoner may prepare his defense; a written statement of the evidence relied upon and the reasons for the disciplinary action; the ability to call witnesses and present documentary evidence in his defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals "; and, legal assistance if the prisoner is illiterate or the issues presented are legally complex. *Wolff*, 418 U.S. at 563-66. The inmate does not have rights of confrontation and cross-examination. *Id*. at 567.

In addition, "some evidence" must support the disciplinary decision. *Superintendent Mass Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985); *see also Wapole v. Hill*, 472 U.S. 445, 454-55 (1984).

Here, Defendants do not argue Plaintiff does not have a protected liberty interest giving rise to procedural protections in connection with his disciplinary proceedings. Instead they argue that he had constitutionally sufficient disciplinary proceedings.

### 3. Analysis

#### a. Witnesses

An inmate "facing disciplinary proceedings should be allowed to call witnesses ... in his defense when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566. Inmates do not have an "unfettered right to call witnesses, but [prison officials] must make the decision whether to allow witnesses on a case-by-

case basis, examining the potential hazards that may result from calling a particular person." *Serrano v. Francis*, 345 F.3d 1071, 1079 (9th Cir. 2003 (citing *Mitchell v. Dupnik*, 75 F.3d 517, 525 (9th Cir. 1995)).The right to call witnesses must be balanced against the prison's needs "to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority[.]" *Wolff*, 418 U.S. at 566.

Stated another way, "the inmate's right to present witnesses is necessarily circumscribed by the penological need to provide swift discipline in individual cases." *Ponte v. Real*, 471 U.S. 491, 495 (1985). "This right is additionally circumscribed by the very real dangers in prison life which may result from violence or intimidation directed at either other inmates or staff." *Id.*

*Wolff* did not require it, but said it would be helpful to cite the reasons for refusing an inmate's request to call a witness "whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases." *Id*. Some eleven years later, the Supreme Court declined to adopt a requirement of giving an inmate written reasons for refusing to call a witness. *Ponte,* 471 U.S. at 496. *Ponte* held, however, that the prison should explain "in a limited manner, the reason why witnesses were not allowed to testify," either as part of the record in the disciplinary hearing, or by presenting testimony in court thereafter. *Ponte*, 471 U.S. at 497. Due process is met "so long as the reasons are logically related to preventing undue hazards to 'institutional safety or correctional goals.'" *Id*. With these limitations in mind, the Supreme Court conceded that a constitutional challenge to a refusal to call witnesses may rarely, if ever, be successful. *Ponte*, 471 U.S. at 499.

Plaintiff has submitted a copy of the written request to call witnesses that he submitted in connection with the disciplinary hearing (ECF No. 112 at 51-52), as well as a transcript of the disciplinary hearing (ECF No. 112 at 31-35) and disciplinary report form (ECF No. 112 at 55). The written list contained the names of nine inmates and then also listed 100 "John Doe" inmates

living in the unit on January 27, 2013 or March 26, 2013. (ECF No. 112 at 51.) It also listed ten specific staff members, as well as Dr. Gedney, the nurses who examined him on March 26, 2013, and any other officers in the unit at the time of the incident. (*Id.*)

The disciplinary hearing transcript also reflects that Plaintiff asked to present witnesses. (ECF No. 112 at 31:13-14.) This was a notice of charges concerning an altercation that Plaintiff was involved with another inmate. Murguia noted that Plaintiff had a list of some 24 people he wanted to call as witnesses, including the inmate involved in the altercation, whom Murguia said "could be considered a victim or co-conspirator." (*Id.* at 33:22-28.) Murguia stated that he considered the other inmate's testimony to be redundant since he was written up for the same charges and would probably say the same thing, and that he would not put a possible victim or co-conspirator in front of the other inmate involved. (*Id.* 34:10-14.)

The disciplinary form also indicates that Plaintiff wanted to call 24 inmates and staff, and that Plaintiff admitted all were not present during the incident. (ECF No. 112 at 55.) Murguia denied the request because all were considered redundant or irrelevant due to the amount of witnesses listed. (*Id.*)

*Wolff's* language that prison officials "must have the necessary discretion to keep the hearing within reasonable limits" rings especially true here. Plaintiff had a list of 24 witnesses. Murguia said that the other inmate's testimony would be redundant as he was written up for the same charges and if he were put in front of Plaintiff, he would probably say the same thing. As to the other witnesses, Murguia said Plaintiff admitted not all were present during the incident, and they would be irrelevant. As such, the court concludes that Murguia did not violate Plaintiff's procedural due process rights under *Wolff* or *Ponte* in refusing his request to call the witnesses.

///

### b. Some Evidence

The court's inquiry into whether the "some evidence" standard is satisfied "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." *Hill*, 472 U.S. at 455. "Instead, the relevant question is whether there is *any* evidence in the record that *could* support the conclusion reached by the disciplinary board." *Id*. at 455-56 (citations omitted) (emphasis added). "The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board." *Id*. at 457.

Here, Murguia found Plaintiff guilty of fighting, indicating the evidence relief upon was the staff report that Plaintiff had used enough force to knock someone's glasses off and pull the person out of their shoes. While Plaintiff may disagree with this finding, it is evidence that could support the conclusion reached by Murguia; therefore, the finding is supported by some evidence. Plaintiff's motion for summary judgment should be denied, and Murguia's should be granted as to Count I.

## B. Count II

### 1. Summary of Argument

In this disciplinary hearing, Plaintiff argues that he asked to call multiple witnesses, and Murguia denied his request. Murguia found Plaintiff guilty and told him he was required to serve 18 months in disciplinary segregation, would be submitted for statutory good time credit forfeiture referral, and would be charged restitution, and would be transferred to another facility. Plaintiff was transferred to ESP which resulted in the permanent forfeiture of personal property or incurring the costs of shipping the property out under State policy in the amount of $539. Plaintiff's placement in segregation resulted in him not being able to hold a job and as a result the loss of

work credits, which extended his term of parole. He claims that this created a liberty interest entitling him to procedural protections at the disciplinary hearing.

Again, in his motion, Murguia does not dispute Plaintiff had a protected liberty interest, but argues Plaintiff had a constitutionally adequate disciplinary hearing because Plaintiff's witnesses were denied for good reason and the decision was supported by some evidence.

**2. Witnesses**

This disciplinary hearing stemmed from charges that while conducting a property inventory in Plaintiff's cell, Sergeant Stalnaker grabbed the back of a gray tub lid to attempt to open and review its contents when sliced his finger on a razor blade (later documented as being four razor blades) that was taped under the lid so that anyone attempting to open the lid would be cut.

Both parties submit a copy of Plaintiff's written request to present witnesses at this disciplinary hearing. (ECF No. 113-1 at 2; ECF No. 112 at 63-64.) This list contained the names of some 68 inmates, as well as 28 staff members.

Plaintiff attaches a copy of the transcript of the disciplinary hearing. (ECF No. 112 at 37-47.)

Murguia went through Plaintiff's list of witnesses at the hearing and asked if they were present when the staff member was injured. (ECF No. 112 at 39-40.) Plaintiff admitted they were not present, and many were not even assigned to that facility. (*Id*. at 40.) Plaintiff also asked to call Sergeant Stalnaker, who Murguia characterized as the victim in this case. (*Id*.) Murguia denied the request to call the inmates as irrelevant or redundant because they were not even present during the incident, and as to others, Plaintiff was not even sure they lived there and would be irrelevant. (*Id*.)

Again, Plaintiff's right to call witnesses is not unlimited. Murguia appropriately denied Plaintiff's request given that he attempted to call so many witnesses, most of whom were not present when the incident occurred. Murguia was within his discretion to not call Sergeant Stalnaker, as he authored the report which Murguia relied upon.

Therefore, Plaintiff was not denied due process in connection with the refusal to call his listed witnesses.

### 2. Some Evidence

As with Count I, Murguia's determination was supported by some evidence: Murguia relied on Sergeant Stalnaker's report and photographs that Plaintiff's tub contained four razor blades that injured the officer, as well as an inmate statement that Plaintiff "rigged" the tub that way because people had been stealing from him.  (ECF No. 112 at 37-47, 61, 66-70.)

Therefore, Plaintiff's motion should be denied as to Count II, while Murguia's motion should be granted.

### C. Counts IV and V–Baker

 Baker's motion for summary judgment does not argue the merits of the First Amendment free exercise claims in Counts IV and V, but instead asserts that Plaintiff did not plead that Baker was personally involved in the alleged constitutional violation so as to state a claim against her. Baker acknowledges, however, that Plaintiff alleges Baker denied his first level grievances on the issue and that she enforced a policy on this issue, but maintains this is insufficient for liability under section 1983.

Plaintiff, on the other hand, argues in his motion for summary judgment that Baker violated his First Amendment rights when he was denied the ability to participate in group Christian

worship services and to receive communion while he was confined at ESP. He asserts that a blanket denial of group worship based only on classification is unconstitutional.

In response, Baker does not dispute Plaintiff was denied the opportunity to engage in group Christian religious services or to receive communion, but argues that the restrictions on his ability to do so do not violate the Constitution because the restrictions are reasonably related to legitimate penological objectives.

**1. Baker's Motion**

First, the court will address Baker's argument that Plaintiff fails to state a claim against her because he does not allege she personally participated in any constitutional violation.

"42 U.S.C. §1983 creates a cause of action against a person who, acting under color of state law, deprives another of rights guaranteed under the Constitution." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). "In order for a person acting under color of state law to be liable under section 1983, there must be a showing of personal participation in the alleged rights deprivation[.]" *Id.* (citations omitted).

Baker admits that Plaintiff alleges that she responded to his first level grievances about his being precluding from attending group religious services and receiving communion while in disciplinary segregation at ESP, and that he alleges she was responsible for a policy in this regard. As the court found on screening, this is sufficient to implicate her in a constitutional violation under section 1983. By way of his grievances, Plaintiff specifically advised Baker that he was being denied the ability to participate in group religious services and to receive communion. (*See* ECF No. 112 at 96-118.) In response to the initial grievance about being deprived of the ability to participate in group religious services, Baker responded: "The informal answer was adequate. It was your actions that brought you to ESP. Per OP 805, 'inmates will be authorized to exercise

accepted and approved religious activities within their assigned cells.' Grievance denied." (ECF No. 112 at 101.)

In response to his next grievance, which specifically raised the denial of the ability to partake in weekly communion, he was told at the informal level: "Your religious beliefs are not being violated. You have the right to practice your religion in the confines of your cell. You may send a kite to the Chaplain to discuss alternatives to weekly communion. You may request the NDOC religious Practice Manual from the Law Library. Grievance Denied." (ECF No. 112 at 112.) He filed a first level grievance, specifically stating that he had already written to and spoken to the chaplain, who told him that as a Jewish rabbi, the chaplain could not administer Christian communion. (ECF No. 112 at 113.) Therefore, Plaintiff claimed there was no alternative for him to receive communion. Baker responded at the first level: "Your religious rights are not being violated. Inmates can exercise their religious activity in their assigned cells as noted in OP 805." (ECF No. 112 at 114.)

Plaintiff was complaining of an ongoing practice of being denied the ability to participate in group religious services and receive communion while housed in disciplinary segregation. Baker knew of the alleged violation, and told Plaintiff specifically that his rights were not being violated, and did nothing to remedy the situation. Even without Plaintiff's allegations that Baker enforced the policy precluding him from group worship and communion, this is sufficient to state a claim that Baker personally violated his rights under the First Amendment.

This was the only basis asserted for Baker's own motion for summary judgment on Counts IV and V (other than the official capacity damages and injunctive relief arguments which will be addressed below); therefore, Baker's motion should be denied as to Counts IV and V.

///

### 2. Plaintiff's Motion

Now, the court will address the arguments as to the merits of the First Amendment claims asserted in Plaintiff's motion for summary judgment, Baker's response and Plaintiff's reply.

The First Amendment prohibits the government from making a law prohibiting the free exercise of religion. "The right to exercise religious practices and beliefs does not terminate at the prison door. The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbit*, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam). In asserting a free exercise claim, an inmate must demonstrate that the "government action in question substantially burdens the person's practice of her religion." *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015) (citation omitted). This is "more than an inconvenience," and instead "must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantially pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* at 1031-32 (citation omitted).

An inmate's First Amendment free exercise claims must be analyzed under *Turner v. Safley*, which holds that prison restrictions will be upheld as long as they are "reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *see also Jones,* 791 F.3d at 1032 (citations omitted). "This approach ensures the ability of corrections officials 'to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration,' and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to 'resolution by decree.'" *Id.* (quoting *Procunier v. Marinez*, 416 U.S. 396, 405 (1974), and citing *Turner*, 482 U.S. at 89, *Bell v. Wolfish*, 441 U.S.520, 548 (1979)).

16

The factors *Turner* cited as relevant to the inquiry of whether the restrictions are reasonably related to legitimate penological interests are: (1) a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2)" whether there are alternative means of exercising the right that remain open to inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives" and the "existence of obvious, easy alternatives." *Turner*, 482 U.S. at 89-91.

Baker does not question Plaintiff's sincerely held religious beliefs or that those beliefs require him to attend weekly religious services and receive communion. The issue, instead, is whether the prison restriction on inmates housed in disciplinary segregation at ESP and classified at level 2 or 3 from attending group religious services and consequently receiving communion at those services is reasonably related to the legitimate penological interests of safety and security cited by Baker.

Plaintiff did not address the *Turner* factors in his motion, instead he only asserts that he was denied the ability to participate in group services and receive communion in violation of his First Amendment free exercise rights. In his reply brief, Plaintiff recognizes Baker's discussion of the *Turner* factors, but says his motion only seeks to establish the facts that he was deprived of access to group worship and communion. (ECF No. 128 at 8.)

As the court indicated above, no one disputes that Plaintiff was denied the ability to engage in group services and receive communion while at ESP. That, however, does not end the court's inquiry. The court must engage in an analysis under *Turner* of the reasonableness of the restrictions in light of the safety and security concerns posited by Baker.

1    First, the court finds there is a valid rational connection between the restriction precluding

2    level 2 and 3 inmates in disciplinary segregation at ESP from attending group religious services

3    and the legitimate governmental interests of institutional safety and security put forward by Baker.

4    Plaintiff alleges that he was transferred to ESP to serve his disciplinary segregation

5    sanction on April 23, 2013. (ECF No. 22 at 40.) He was housed at ESP from April 23, 2013 until

6    December 23, 2015, in either disciplinary segregation, administrative segregation, and then in

7    general population but was still close custody. (*Id*.) He avers that in any of these housing

8    classifications at ESP he was precluded from access to "corporate" or group Christian worship

9    services and consequently from receiving communion.

10    Baker has submitted evidence that Plaintiff was transferred to ESP on April 23, 2013, to

11    serve out a disciplinary sanction after being found guilty of major disciplinary violations including

12    assault and battery and contraband possession where he was found to have placed razor blades on

13    the inside of a property tub that injured an officer. (Byrne Decl., ECF No. 125-9 ¶¶ 9, 10.)[2]

14    From June 2008 until October 2013, ESP utilized a level system for housing classification

15    set forth in ESP's Operational Procedure (OP) 735. (ECF No. 125-7.) Initially, there were three

16    levels which determine the activities the inmate may engage in while housed at ESP. Inmates

17    classified to level 1 had the least restrictive housing assignment, while levels 2 and 3 had more

18    restrictions. (ECF No. 125-7 at 2.) Inmates could progress within the system. (*Id*.) To be classified

19    to level 1 an inmate, among other things, must not have had any major or general disciplinary

20    violations in the prior 12 months. (*Id*.) Inmates in level 1 had access to the chapel for religious

21    services in groups no larger than 20. (*Id.* at 3.) To be classified to level 2 an inmate, among other

22    things, must not have had any major or general disciplinary convictions within the prior six

23

---

[2] Harold M. Byrne is an Associate Warden at ESP.

months. (*Id.*) Inmates classified to level 2 had no direct chapel access, but were permitted to address religious requests with the institutional chaplain. (*Id.* at 4.) Inmates who had completed disciplinary segregation were placed in level 3 based on a positive recommendation from the unit caseworker. (*Id.*) Like level 2, level 3 inmates did not have direct access to the chapel, but were permitted to address religious requests through the institutional chaplain. (*Id.* at 5.)

OP 735 was revised in October of 2013 to provide for a two-level classification system with levels 1 and 3. (ECF No. 125-8.) The criteria for level 1 was generally the same, with inmates in level 1 having access to the chapel for group religious services. (*Id.* at 3.) Like the prior version, inmates who completed disciplinary segregation were placed in level 3 housing based on a positive recommendation from the caseworker. (*Id.*) Inmates in level 3 did not have direct chapel access, but could make religious requests through the chaplain. (*Id.* at 4.)

Plaintiff was assigned a risk factor score based on a review of his history of institutional violence, the fact that it occurred within the last six months, the severity of the offense and prior offense history. (Byrne Decl., ECF No. 125-9 ¶¶ 10-13.) He was in disciplinary segregation at ESP from May 7, 2013 until October 9, 2013. (*Id.* ¶ 12.) On October 5, 2013, he moved to level 2. (*Id.* ¶ 13.) According to Byrne, he could not progress to level 1, which would have allowed him to participate in group religious services at ESP, because of his disciplinary charges and risk factor score, which rendered him close custody. (*Id.* ¶¶ 13-15.) Byrne states that the reason for limiting inmates classified to level 2 or 3 serving disciplinary sanctions from participating in group religious services is to minimize the opportunity for violence by inmates who have demonstrated behavior issues (as a result of their disciplinary violations) which jeopardize institutional safety and security. (*Id.* ¶ 16.)

In sum, Baker presents legitimate institutional safety and security concerns posed by inmates found guilty of major disciplinary violations and sentenced to terms in disciplinary segregation being able to attend group worship services. Prison officials consider various factors in determining the classification status of inmates assigned to serve a disciplinary segregation term at ESP, Nevada's maximum-security prison. Those assessed with the highest risk score are precluded from attending group worship services to minimize the risk of violence from inmates who have been found guilty of disciplinary violations and whose risk status required their disciplinary segregation sentence to be served out at the maximum-security prison. Plaintiff was convicted of major disciplinary violations that involved violence injuring a staff member. He presents no evidence in response that would indicate the prison's safety and security concerns were not legitimate. Therefore, this factor weighs in Baker's favor, at least insofar as Count IV is concerned.

Neither party specifically addresses the inability of Plaintiff to partake in communion and the relationship between that specific restriction and prison concerns of safety and security. On the one hand, the same justifications for the restriction seem to apply to the extent Plaintiff could receive communion at a group worship service. On the other hand, Baker does not specifically address Plaintiff's request in the grievance she responded to that he be given an alternative means of receiving communion (directly in his cell, for instance). Therefore, the court cannot determine the impact of this factor on Plaintiff's claim in Count V.

Second, the court must consider " whether there are alternative means of exercising the right that remain[ed] open" to Plaintiff.

As was pointed out in *O'Lone*, a ban on level 2 and 3 inmates from attending group worship services necessarily means there is no alternative means for those inmates to attend the group religious service.

The Supreme Court has instructed that while a ban on attending an essential religious ceremony is not to be minimized, this does not necessarily mean that the Constitution requires prison officials to "sacrifice penological objectives" to accommodate the religious tenet. *O'Lone*, 482 U.S. at 351-52. The inquiry is whether the inmate is deprived of "all forms of religious exercise." *Id.* at 352. Baker asserts that Plaintiff could pray in his cell, could request a one-on-one meeting with the chaplain or priest and could have religious books in his cell. (ECF No. 125 at 11:21-23.) Plaintiff does not specifically address the ability to pray in his cell or access religious literature or present requests to the chaplain. The evidence he presents does indicate that the chaplain was a Jewish rabbi. While Baker states in argument that Plaintiff had access to a chaplain or priest there is no actual evidence in the record that Plaintiff had any access to a priest or other leader of his Christian faith. In addition, it is not clear on this record whether having access to religious literature would satisfy Plaintiff's religious tenets.

*O'Lone* stated that the ability to participate in other religious observances supports a conclusion that the restriction on attending the group religious service is reasonable. *Id.* In *O'Lone,* the inmates were denied the opportunity to attend a Muslim weekly religious service, but still had a virtually unlimited right to congregate for prayer and discussion outside working hours, had free access to an imam, a Muslim prayer leader, and were given special meals and arrangements to observe Ramadan.

*Ward v. Walsh*, 1 F.3d 873 (9th Cir. 1993), involved an Orthodox Jewish inmate who did not have access to an Orthodox rabbi or religious services (he was the only Orthodox Jewish

prisoner in the institution), and could not congregate with other practitioners of his faith for prayer and discussion, but could engage in private prayer. There, the Ninth Circuit stated that it could not conclude "that the opportunity to engage in private prayer is enough to satisfy the second *Turner* factor as interpreted by *O'Lone*." *Ward*, 1 F.3d at 878. The court pointed out that if the ability to engage in private prayer was enough to satisfy the second *Turner* factor, that "factor would have no meaning at all because an inmate would always be able to pray privately." *Id*. (citation omitted). As such, the court concluded the inmate's religious practice was dramatically curtailed and so the second *Turner* factor weighed in the inmate's favor.

Here, the record is devoid of evidence concerning what Plaintiff could do to practice his faith other than pray in his cell. Therefore, the court cannot make a determination as to the impact of the second *Turner* factor on Count IV.

With respect to Count V, Baker does not specifically address whether there were any alternatives for Plaintiff to receive communion, for instance, the ability to have it administered to him in his cell.

The record seems to suggest that there was no alternative means of Plaintiff receiving communion. In his grievance on the communion issue, Plaintiff was advised in response to the informal level grievance to contact the chaplain to discuss alternatives to weekly communion. In his first level grievance, Plaintiff noted that he previously wrote and spoke to the chaplain about this issue, and that since the chaplain was a Jewish rabbi, he could not administer Christian communion; therefore, there was no alternative for him to receive communion. (ECF No. 112 at 113.) In response, Baker stated: "Your religious rights are not being violated. Inmates can exercise their religious activity in their assigned cells as noted in OP 805." (*Id*. at 114.) Baker did not

address his concerns about receiving communion. Therefore, this factor appears to weigh in Plaintiff's favor with respect to Count V.

Third, the court will address the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally.

Baker argues that the impact of accommodating group worship for high risk level inmates would be substantial because guards must monitor the services and individually search each inmate before and after the services. Plaintiff presents no argument or evidence to contradict this assertion. The court acknowledges that allowing these higher risk inmates to participate in group worship would undoubtedly impose additional burden and expense on the prison in terms of maintaining security and safety of the inmates and staff in the context of a group gathering. Therefore, this factor weighs in favor of Baker as to Count IV.

Baker does not specifically address, however, any impact accommodating Plaintiff's request for an alternative for receiving communion, perhaps in his cell by a priest or faith leader, would have on guards, inmates and allocation of prison resources generally. With no evidence on this issue, the court cannot make a determination as to the impact of the third *Turner* factor on Count V.

Finally, the could will look at the "absence of ready alternatives" and the "existence of obvious, easy alternatives."

Baker asserts that there are no readily available alternatives to the ESP regulation limiting group religious services to level 1 inmates. (ECF No. 125 at 10.) Plaintiff does not provide any readily available alternative to the restriction on group religious services. Giving deference to prison officials, this factor weighs in favor of Baker as to Count IV.

While there may be no ready alternative to having group religious services for high risk inmates at ESP, Baker does not discuss any readily available alternatives to providing Plaintiff the ability to receive communion. Plaintiff's grievance alluded to the fact that he could possibly receive communion in his cell by some other method, though he does not elaborate on any such options in his briefing. Again, the court cannot ascertain th1e impact of the fourth *Turner* factor as to Count V.

In sum, there are factual issues concerning whether the restrictions on Plaintiff's religious exercise are reasonably related to legitimate penological purposes. Therefore, Plaintiff's motion for summary judgment should be denied as to Counts IV and V.

**D. Official Capacity & Monetary Damages**

Defendants are correct that "[f]ederal courts are barred by the Eleventh Amendment from awarding damages against state officials acting in their official capacities[.]" *Snow v. McDaniel*, 681 F.3d 978, 991 (9th Cir. 2012) (citation omitted). Therefore, Defendants' motion for summary judgment should be granted insofar as the official capacity damages claims are concerned. Plaintiff is correct that he may proceed with his damages claims against defendants in their individual capacities.

**E. Claims for Injunctive Relief**

Defendants argue Plaintiff's claims for injunctive relief are moot because of his release from prison. Plaintiff argues that the cases Defendants rely on are fact specific.

Defendants are correct that an inmate's claims for injunctive and declaratory relief are rendered moot when he is released from prison. *Cano v. Taylor*, 739 F.3d 1214, 1217 (9th Cir. 2014) ; *see also Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015).

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order:

(1) **DENYING** Plaintiff's motion for summary judgment as to Counts I and II;

(2) **GRANTING** Murguia's motion for summary judgment as to Counts I and II;

(3) **DENYING** Baker's motion for summary judgment as to Counts IV and V;

(4) **DENYING** Plaintiff's motion for summary judgment as to Counts IV and V;

(5) **GRANTING** Defendants' motion for summary judgment insofar as Plaintiff seeks to recover damages against them in their official capacities;

(6) **GRANTING** Defendants' motion for summary judgment with respect to Plaintiff's claims for injunctive relief as Plaintiff has been released from prison and is no longer subject to the offending policies/practices.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: January 7, 2019.

_William G. Cobb_
William G. Cobb
United States Magistrate Judge